**Application of Raymond A. BANKOWSKI.**

**Patent Appeal No. 6960.**

United States Court of Customs and Patent Appeals.

June 20, 1963.

Rehearing Denied Sept. 27, 1963.

Mellin, Hanscom & Hursh, LeRoy Hanscom, San Francisco, Cal., Raymond W. Colton, Washington, D. C., and Ernest Miles Anderson, San Francisco, Cal., for appellant.

Clarence W. Moore, Washington, D. C. (Jack E. Armore, Washington, D. C.,

of counsel), for Commissioner of Patents.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH and ALMOND, Judges.

SMITH, Judge.

Appellant has appealed from an adverse decision of the Board of Appeals which affirmed the examiner's rejections of all ten claims in his application[1] for patent on "Avian Pneumoencephalitis Virus Vaccine and Method of Making."

Appellant's invention relates to a live virus vaccine for immunizing chickens against pneumoencephalitis or Newcastle disease. Appellant points out in his specification that prior vaccines containing Newcastle disease virus (abbreviated NDV), although capable of giving a relatively long lasting immunity, are not completely satisfactory because they cannot be used on young chicks and a number, from ½ to 12 percent, of healthy birds are frequently killed when vaccinated. These vaccines also can result in spreading the disease from the vaccinated chickens to susceptible or non-immune chickens. In addition, appellant has pointed out in the specification that:

> "Infections of the respiratory tract caused by more than one agent are known as a 'respiratory disease complex', and contributing to the spread of this disease are the vaccines (containing live, virulent producing agents) for laryngotracheitis, fowl pox, infectious bronchitis, and Newcastle Disease. The administration of such vaccines increases the concentration of these agents in the area in question, and this perpetuates the disease and constitutes a continuous threat to susceptible birds."

One of the stated objects of appellant's invention is the provision of a completely attenuated NDV[2] for use in vaccine.

A second object of appellant's invention is stated to be the provision of a NDV vaccine which is free of the respiratory disease complex present in prior NDV vaccines.

Of the ten rejected claims on appeal, eight are process claims to the production of such a vaccine and two are drawn to a vaccine produced by the claimed process. Claims 1 and 2 recite appellant's process for *producing* an attenuated NDV only and claim 9 is for the product of claim 1. Claims 6, 7 and 8 recite appellant's process for *propagating* an attenuated vaccine in a culture medium free of avian tissue which, appellant asserts, results in the production of a vaccine which is free of the respiratory disease complex. Claim 10 calls for the vaccine produced by the process of claim 6. Claims 3, 4 and 5 recite appellant's process of producing an attenuated vaccine *and* propagating it in a medium free of avian tissue.

In its affirmance of the examiner's rejections of the appealed claims, the board relied upon the following references:

Sanders et al., A.M.A. Archives of Pathology, Vol. 56, No. 2, Aug. 1953, Page 199, 167-TC.

Henle et al., P.S.E.B.M., Vol. 89, No. 4, Aug.–Sept. 1955, Pages 556 to 560, 167-TC.

The Sanders et al. article states generally that several workers had obtained some success in producing an attenuated NDV vaccine in an artificial culture medium. The work of Bankowski, the applicant, and Boynton is described by Sanders et al. as follows:

> " * * * In the first studies (Bankowski and Boynton) liver and heart of 10 to 13-day chick embryos were used. However, it was later demon-

---

1. Serial No. 681,445, filed September 3, 1957.

2. An attenuated NDV is said by appellant to be one in which the lethal factor (present in prior vaccine viruses) is removed, but in which the virus retains its immunizing powers.

strated that the virus propagated as readily in a medium containing minced whole embryos. The tissues were suspended in either bovine or chicken serum ultrafiltrate. A loss of the capacity for chicken blood cell agglutination was noted in early passages, but embryo pathogenicity was retained, and allantoic fluid of killed embryos contained hemagglutinin. Virus cultivated in the presence of bovine serum ultrafiltrate steadily decreased in virulence for chickens; 40th to 50th passage subcultures failed to produce symptoms in fowl. The culture virus was still capable of immunizing chickens against 200,000 MLD. Laboratory and field vaccination trials with this attenuated strain of virus administered by the air-borne route to chickens were highly encouraging. The modification of the virus in the chicken serum ultrafiltrate cultures was somewhat less marked. * * *"
[Footnotes omitted]

The Henle et al. article discloses, inter alia, that a mumps virus was propagated in artificial culture media containing living human cancer tissue (Hela cells) or monkey kidney cells.

The examiner and board rejected some or all of the claims for four different reasons. Each rejection will be discussed separately.

(1) *The rejection of all claims as indefinite and functional.* (35 *U.S.C.* § 112)

The examiner, in his answer, stated that:

"The claims are further indefinite in their failure to properly define the end point of the claimed process. The step of propagating in non-avian tissue (as contained in claims 3–8) is given no end-point at all. The step of attenuating in avian tissue is conducted (according to claims 1–5) 'until said virus has become attenuated'. Since the alleged invention resides, at least in part, in the attenuation this type of 'functional' phraseology seems highly improper."

It is the position of the solicitor that the claims fail to particularly point out and distinctly claim that which appellant regards as his invention as required by the second paragraph of 35 U.S.C. § 112 because the claims do not define the end point of the attenuation process, i. e., the point at which the virus becomes attenuated. For this reason it is urged that the claims are "functional at the point of novelty and therefore unpatentable."

■ We do not agree with the examiner, board, and solicitor that such a recital renders these claims indefinite within the requirement of 35 U.S.C. § 112. First, claims 1 to 8 define a process for attenuating and propagating NDV. The specification points out that attenuation is determined by actually testing a vaccine of the NDV on laboratory animals and that the attenuation point is otherwise unpredictable. As stated in appellant's brief:

"More specifically, the attenuation of NDV by its serial passage through an artificial medium involves, for example, setting up a series of test tubes, each partially filled with a suitable artificial medium in which NDV will propagate. The first test tube is inoculated with live virus and allowed to incubate; the second test tube is then inoculated with some of the material from the first test tube and allowed to incubate; the third test tube is then inoculated with material from the second test tube, etc. *This procedure is carried on until a point is finally reached where, by actual animal tests, a generation of virus is arrived at which is sufficiently attenuated to serve as a live virus vaccine. If other similar series of serial passages are made, the chances are that different end points will be found. In other words, it is impossible to predetermine how*

many serial passages must be made before proper attenuation occurs. Once it does occur, the last generation can be used as a source of attenuated virus for propagating additional quantities thereof. All this is currently done commercially, and the end point is determined by animal tests set forth by the Government." [Emphasis added.]

Thus, we cannot agree that the claims are "indefinite" because they fail to specify a definite number of serial passages before attenuation occurs. The tests used to determine whether the virus is attenuated are well known to those of ordinary skill in this art and apparently are so standardized that it is no more than a routine measurement of the lethal factor of the virus. As indicated above, there appears to be no other way to determine when the NDV has become attenuated.

Secondly, we do not agree that these claims are "functional at the point of novelty." The procedure of attenuating NDV by its serial passage through an artificial medium is a known procedure, as disclosed by Sanders et al. and is in commercial use. This procedure is carried out until attenuation occurs as determined by animal tests. Appellant lays no claim to this procedure. The novel steps that appellant seeks to claim are that (1) this procedure be carried out in accordance with Sabin's large-volume, rapid-passage technique and (2) that the attenuated virus be thereafter propagated in an artificial medium devoid of avian tissue. Thus, the questioned term "until the virus has become attenuated" does not occur at the exact point of novelty of appellant's invention. Also, since the serial-passage procedure of attenuating NDV is well known, we see no reason why appellant's claims should detail the procedure by which the determination is made. It is sufficient that they merely call for this control measurement. Therefore, the rejection of all claims as "indefinite and functional" is reversed.

(2) The rejection of claims 1, 2 and 9 as unpatentable over Sanders et al., (35 U.S.C. § 103).

These claims, as previously stated, are concerned with producing an attenuated NDV vaccine only. Claim 1 is illustrative and is as follows:

"1. The method of producing a live virus vaccine for Newcastle Disease comprising: propagating and serially passing avian pneumoencephalitis virus through a Simms-Sanders solution containing living chicken tissue until said virus has become attenuated in accordance with Sabin's rapid passage, large volume technique."

Appellant points out in his brief that the known method of producing a NDV vaccine is to serially pass it through an artificial culture medium. Appellant further acknowledges that the details of preparation of the claimed artificial medium are known and that he does not "lay any claim, per se, to the Sabin technique * * *." The essence of the invention as claimed in claims 1, 2 and 9 is said to be the employment of the rapid-passage Sabin technique in preparing attenuated NDV vaccine. The Sabin technique, previously used in connection with poliomyelitis virus, is described in appellant's brief as follows:

"The large-volume, rapid-passage Sabin technique involves inoculating each test tube with a substantially larger quantity of the contents of the preceding test tube than would normally be used, and materially decreasing the time that each test tube is allowed to incubate."

In affirming the examiner's rejection, the board stated that:

"The Sabin technique has been urged, throughout the prosecution of this application by appellant, to be a well known, recognized technique and the broad application thereof in the manner set forth in the claims, to the attenuating process of Sanders et al., even though it may in-

782

volve a different virus, would, in our opinion, be obvious to one skilled in the art. As pointed out by the Examiner the process of the claims, in the terms set forth, does not produce an unexpected result; there is no comparison of the vaccine produced by the claimed process with the satisfactory vaccine of Sanders et al. We note, at this point, that these claims do not contain the complete procedure which appellant alleges to produce the improvement over the product described in Sanders et al. This rejection will, therefore, be sustained."

■ We are of the opinion that the examiner and board are correct as to this rejection of claims 1, 2 and 9. First, it is not clear from the disclosure that the attenuated NDV produced by appellant's claimed process using the Sabin technique is patentably different from the attenuated NDV vaccines described in the Sanders et al. reference. While appellant states in his specification that prior vaccines "are not satisfactory for from ½ to 12 per cent of normal healthy birds are frequently killed when vaccinated therewith, * * *", the Sanders et al. article indicates some degree of successful attenuation had been attained by others, including appellant and Boynton. The record here contains no comparative tests which would indicate the vaccine, as claimed in these claims, possesses unexpected properties over the prior vaccines.

Secondly, in the absence of a showing of unobvious properties thus imparted to the attenuated vaccine produced by the method claimed in claims 1, 2 and 9, we think it would have been obvious to a person skilled in this art to utilize the Sabin rapid-passage technique in the culturing of an attenuated NDV. Appellant states in his brief that "The serial-passage method of producing attenuated NDV is disclosed by Sanders et al. and is in commercial use" and, further, that the Sabin technique "can be applied to the serial-passage procedure of Sanders

et al. without modification." Appellant's specification also states that the Sabin technique is "well-recognized." Therefore, application of this well-recognized technique, without modification, to the serial-passage method disclosed by Sanders et al. would, it seems to us, be obvious to one of ordinary skill in this art.

While appellant urges that the Sabin technique, previously used with poliomyelitis virus, would not necessarily be successful in attenuating NDV, a completely different virus, we do think use of the Sabin technique in attenuating NDV would be obvious to a person of ordinary skill in this art. The examiner points out in his answer, and appellant does not dispute, that there are only a limited number of tissue-culturing techniques used in this art. To select one of these known techniques and apply it to a different virus seems to us to be within the expected skill of the art. We therefore affirm the rejection of claims 1, 2 and 9.

(3) *The rejection of claims 3, 6, 7, 8, 9 and 10 "as failing to properly define the invention." (35 U.S.C. § 112)*

Claim 3 is illustrative of this group of claims and is as follows:

"3. The method of producing a vaccine for Newcastle Disease comprising: propagating and attenuating avian pneumoencephalitis virus by serially passing it through a Simms-Sanders solution containing living chicken tissue and then propagating the virus so attenuated in an artificial tissue culture medium devoid of avian tissue."

It is the board's position that the expressions "devoid of avian tissue" (claim 3) and "other than avian tissue," (claim 6), are *negative limitations* which render the claims "so broad as to read upon any and all possible artificial tissue culture media, other than those of avian source."

■ As pointed out by the examiner in his answer, negative limitations, *per*

*se*, do not necessarily fail to define the invention. The Manual of Patent Examining Procedure, 3rd Ed., Sec. 706.03(d) refers to a negative limitation such as "non-poisonous" or "non-alcoholic" as not indefinite since it leaves a single and definite alternative and may be the least cumbersome way to express the limitation. However, a negative limitation such as "metal, except for nickel", may, under certain circumstances, be indefinite or too broad if the alternatives to nickel are many and not all are acceptable alternatives.

■ As properly pointed out by the solicitor in his brief, claim 7 requires that the attenuated NDV be propagated "in an artificial medium containing living bovine kidney cells, but devoid of avian tissue." Claim 8 specifies "Hela cells" instead of "bovine kidney cells." These claims do not appear to us to be objectionable since they affirmatively specify the constitution of the culture media. For the same reason that the board reversed the examiner's rejection of claims 4 and 5[3] on this ground, we reverse the board's rejection of claims 7 and 8 on this ground. Claim 9 is dependent on claim 1 which contains no negative limitation. Therefore, the board's rejection of claim 9 on this ground is reversed.

Claims 3, 6 and 10, as noted, specify only that the attenuated NDV be propagated "in an artificial tissue culture medium devoid of avian tissue." In his specification, appellant describes propagation in culture media containing bovine kidney cells *or* Hela cells. We think these claims, which specify only that the culture media be non-avian, are too broad and indefinite since they would include all other possible culture media. The record does not show whether routine experimentation would indicate a suitable culture media. The Sanders et al. article indicates that NDV could not be successfully propagated on Erlich tumor tissue. This indicates that the lim-

itation to a culture medium devoid of avian tissue is not acceptable. We will, therefore, sustain the rejection of claims 3, 6 and 10 as too broad and indefinite.

(4) *The rejection of claims 6–8 as failing properly to define the invention and as too broad.*

■ Claims 6–8 define the process of propagating an attenuated NDV in an artificial medium free of avian tissue. The board's position is stated as follows:

"We also agree with the Examiner's criticisms of claims 6, 7 and 8 in the definition of the starting material as 'attenuated avian pneumoencephalitis virus' since the only disclosed operative species of such virus, propagated in non-avian tissue, is the attenuated virus further treated by the Sabin technique. There is no indication, that Newcastle Disease virus attenuated in any other manner will propagate in non-avian medium. As we have pointed out above, Sanders et al. indicate areas of probable inoperativeness. The Examiner's rejection will, therefore, be sustained."

As we understand the above statement of the board, its position is that the only attenuated NDV which is disclosed as propagating on a non-avian tissue media is appellant's own which has been attenuated by the Sabin rapid-passage technique. We cannot understand why this should make claims 6–8 too broad or indefinite in the absence of some showing that *other* attenuated NDV would not propagate on non-avian tissue. As explained in detail in appellant's specification, the purpose of using non-avian tissue for NDV propagation is to remove the respiratory disease complex. Attenuation, which removes the lethal factor from the NDV, and propagation in non-avian tissue, which keeps out the respiratory disease complex, are separate steps for separate purposes. Appellant has not claimed that attenuated NDV is new, but asserts that the process of attenua-

---

**3.** Claim 4 requires "bovine kidney tissue, but free of avian tissue." Claim 5 states

"living Hela cells and free of avian tissue."

tion of NDV *using the Sabin technique* and the products of that process are new and unobvious. Since this process of attenuation and the process of propagation on non-avian tissue are distinct and separate, there is nothing in the record to indicate that all attenuated NDV vaccines would not propagate on non-avian tissue. Therefore, claims 6–8 which define only the process of propagating an already attenuated NDV do not appear to be either too broad or indefinite. This rejection of the board is reversed.

In summary, we *affirm* the rejection of claims 1, 2, 3, 6, 9 and 10 but reverse the rejection of claims 4, 5, 7 and 8.

Modified.