**MOLECULON RESEARCH CORPORATION,**
Plaintiff,

v.

**CBS, INC., Defendant.**

**Civ. A. No. 82–289–WKS.**

United States District Court,
D. Delaware.

Oct. 2, 1984.

**1422**

Thomas S. Lodge, Connolly, Bove, Lodge & Hutz, Wilmington, Del., Robert X. Perry, Jr., J. Carter McKaig, Stephen H. Lorberbaum, Wilkes, Artis, Hedrick & Lane, Washington, D.C., W. Brown Morton, Jr., Warsaw, Va., for plaintiff.

Walter L. Pepperman, II, Morris, Nichols, Arsht & Tunnell, Wilmington, Del., Lewis H. Eslinger, Hugh C. Barrett, Eslinger & Pelton, New York City, Dean C. Dunlavey, Los Angeles, Cal., for defendant.

## OPINION

STAPLETON, Chief Judge:

This is an action for patent infringement brought by the plaintiff, Moleculon Research Corporation ("Moleculon"), as assignee of U.S. Letters Patent No. 3,655,201 ("the '201 patent") from Larry D. Nichols, the inventor. Moleculon charges the defendant, CBS, Inc. ("CBS"), as the successor to the Ideal Toy Corporation ("Ideal"), with infringement of Claims 3, 4, 5, 6 and 9 of the '201 patent. The subject of the '201 patent, in its preferred embodiment, is a cube puzzle composed of eight smaller cublets that may be rotated in groups of four adjacent cubes, and a method by which the sets of cubes may be rotated, first to randomize, and then to restore a predetermined pattern on the six faces of the composite cube.

The issues relating to damages and other possible relief were severed and a trial was held on the issues of validity and infringement. This opinion constitutes my findings of fact and conclusions of law with respect to validity and infringement.

## I. THE BACKGROUND FACTS

Nichols' interest in puzzles began at the age of five or six. His interest in the familiar "Sam Loyd 15" puzzle [1] evolved into a desire to improve on what he perceived to be its shortcomings. In particular he, considered various ways of eliminating the empty space, while allowing pieces to be moved.

During an evening stroll in the Summer of 1957, these thoughts and ideas suddenly fell into place in Nichols' mind and he conceived of a three-dimensional puzzle capable of rotational movement. Nichols quickly envisioned an assembly of eight cubes

---

1. The Sam Loyd 15 puzzle, invented in 1873, is the familiar square, two dimensional puzzle inset with fifteen flat square numbered tiles and an empty space that could accommodate a sixteenth tile. The tiles can be moved one at a time by sliding them into the empty space.

stacked in a $2 \times 2 \times 2$ arrangement, with each of the six faces of the composite cube distinguished by a different color. He recognized that the smaller cubes would be rotated in sets of four around one of three mutually perpendicular axes. He felt immediate satisfaction at having arrived at this concept.

Nichols very quickly realized that magnets could be used to hold the cubes in assembled form yet allow rotational movement. His efforts to conceive of a feasible mechanical means of assembly proved more difficult; however, by the Fall of 1957, Nichols believed that a double tongue-in-groove arrangement could be made to work.

During the period 1957–1968, Nichols constructed several models of his puzzle, making cubes of heavy file-card type paper and affixing small magnets to the inside of the small cubes. These models confirmed the feasibility of Nichols' conception, but lacked durability. During this period he also attempted to explore mechanical alternatives, such as engaging the cubes through a tab-and-slot arrangement, but these experiments were not satisfactory.

Nichols spent the years 1959–62 as a graduate student in organic chemistry at Harvard. During this period, a few close friends, including two roommates and a colleague in the Chemistry Department, had occasion to see one of these paper models in Nichols' room and Nichols explained its operation to at least one of them.

In 1962, after completing the requirements for a Ph.D. in organic chemistry, Nichols accepted employment as a research scientist at Moleculon. In 1968, Nichols happened upon some small, strong and relatively inexpensive magnets in a retail store. Realizing that he now had access to machining equipment at work, he undertook to make a wood block prototype of his puzzle. Working after working hours, he drilled holes in the internal faces of eight small wooden blocks, inserted the magnets, properly oriented them, and glued them in. He then painted each of the six faces of the composite cube a different color. To his satisfaction, it held together nicely.

Nichols usually kept the puzzle at home, but on occasion brought it to his office to work on it or to play with it. In early January of 1969, Dr. Obermayer, the president of Moleculon, entered Nichols' office and happened to see the model sitting on his desk. He immediately expressed an interest in the puzzle, and in response, Nichols explained its workings. He asked to take it home and was given permission to do so. Obermayer asked whether Nichols intended to commercialize the puzzle. When Nichols answered in the negative, Obermayer suggested that Moleculon attempt to do so and Nichols expressed general agreement. In March of 1969, Nichols signed a written agreement assigning all his rights in the puzzle invention to Moleculon in return for a share of any proceeds of commercialization. Moleculon in turn assumed all expenses of commercializing the puzzle.

Shortly thereafter Moleculon undertook an extensive effort to commercialize the puzzle. Obermayer called Parker Brothers in February of 1969 to determine whether they had an interest in receiving for consideration puzzle ideas from outside inventors and, if so, how one should go about making a submission. Parker Brothers responded with a letter and booklet describing their general practice regarding puzzle and game submissions and on March 7, 1969, Moleculon sent Parker Brothers an actual model and a description of the cube puzzle. During the subsequent three year period, Moleculon contacted between fifty and sixty toy and game manufacturers. Among those contacted was Ideal. Moleculon sent Ideal only a generalized, non-specific description of the puzzle, and Ideal responded to the effect that it did not currently have an interest in marketing the puzzle. In fact, Moleculon did not succeed in marketing the Nichols cube.

Toward the end of 1969, Nichols began working on a patent application for his puzzle. After several drafts were exchanged between Nichols and his attorney,

a patent application was filed on behalf of Moleculon on March 3, 1970. On April 11, 1972, the '201 patent covering Nichols' invention was issued.

In February or March of 1981, Obermayer first became aware of Ideal's Rubik's Cube through items in the press. Shortly thereafter, he purchased a Rubik's cube. Struck by the similarity to the Nichols' cube, Obermayer wrote to the president of Ideal calling his attention to the '201 patent. Ideal, through its patent attorney, responded that it had studied the prior art and believed that Rubik's Cube did not infringe any valid patent claims. In August 1981, Obermayer met with Ideal's chairman to discuss the possibility of Ideal licensing the '201 patent. At that meeting, Obermayer was given a copy of U.S. Letters Patent No. 3,081,089 issued to Gustafson on March 12, 1963 ("the Gustafson Patent"). When subsequent meetings between counsel for Moleculon and Ideal failed to produce an agreement, this suit was instituted. During the pendency of this litigation, Ideal was acquired by CBS.

It is not claimed that Ideal was aware of or in any way derived its Rubik's Cube from the '201 patent. On the contrary, the Rubik's Cube was first brought to Ideal's attention by an inventor's agent from England. Captivated by the puzzle, Ideal executives concluded a licensing agreement with the Hungarian state agency, Konsumex, and in February 1980, the Rubik's Cube was introduced to the trade at the International Toy Fair in New York City. The Rubik's Cube was patented in Hungary, but was marketed by Ideal in the United States without seeking the benefit of patent protection over the cube puzzle itself. Ideal did, however, obtain trademark protection for the "Rubik" name and certain of the internal mechanisms were patented.

## II. THE PRESUMPTION OF VALIDITY

■ The '201 patent is presumed valid pursuant to 35 U.S.C. § 282. This presumption may be overcome only by evidence which demonstrates invalidity clearly and convincingly. Moreover, the Court of Appeals for the Federal Circuit has recently held that the presumption of validity is neither weakened nor destroyed by pertinent prior art not considered by the Patent and Trademark Office ("PTO"), and that 35 U.S.C. § 282 requires a court to presume that the patent is useful, novel and nonobvious as well as not subject to a statutory bar. *Medtronic, Inc. v. Cardiac Pacemakers, Inc.*, 721 F.2d 1563, 220 U.S.P.Q. 97 (Fed.Cir.1983); *Leinoff v. Louis Milona and Sons, Inc.*, 726 F.2d 734, at 738 (Fed. Cir.1984) citing *Stratoflex, Inc. v. Aeroquip Corp.*, 713 F.2d 1530, 1534, 218 U.S. P.Q. 871 (Fed.Cir.1983); *TP Laboratories v. Professional Positioners*, 724 F.2d 965 (Fed.Cir.1984).

## III. SECTION 102(b) BARS

The first defense raised by CBS is that the '201 patent is invalid because the Nichols cube puzzle was in public use and on sale more than one year prior to the date of the U.S. patent application. Section 102(b) provides in pertinent part that "[a] person shall be entitled to a patent unless—

the invention was ... in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."

■ The "public use" and "on sale" bars are two different defenses that must be considered separately; however, a determination of when the Nichols invention was reduced to practice is necessary in either case. The Section 102(b) bars come into play only after the invention has been reduced to practice: "[A]n invention cannot be offered for sale until it is completed, which requires not merely its conception but its reduction to practice." *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, LTD*, 731 F.2d 831, 838 (Fed. Cir.1984), citing *Timely Products Corp. v. Arron*, 523 F.2d 288, 302 (2d Cir.1975). This means that the complete invention, as reflected in the patent claims, must have been embodied in, or obvious in light of, the thing whose use or sale is said to come within Section 102(b).

Reduction to practice is not, however, to be equated with commercial marketability. In fact, "it is immaterial that the device was a makeshift or 'Rube Goldberg' embodiment" so long as any modifications made along the road to commercial marketability do not involve limitations in the claims. *Barmag, supra* at 838. In light of these principles, I conclude that the early paper-and-magnet models constructed by Nichols while a graduate student at Harvard constituted a reduction to practice. The fact that they lacked durability and were clearly makeshift does not alter the fact that the device was plainly functional for its intended purpose.

Moleculon urges that a reduction to practice occurred only when Nichols constructed his first wooden block-and-magnet model in 1968. That position is clearly inconsistent with the law as enunciated in the *Barmag* case, however, since this change in materials is in no way reflected in the ultimate patent claims. Moleculon adds by way of footnote in its post-trial reply brief that "[e]ven if the Harvard paper models constituted a reduction to practice, they were obviously experimental and cannot form the basis of a public use." [R.B. 5]. However, experimentation in the sense of refinement, occurring after a reduction to practice, does not preclude the applicability of Section 102(b). *In re Smith*, 714 F.2d 1127 (Fed.Cir.1983).

### A. "Public Use"

During the years 1959 to 1962, while Nichols was a graduate student at Harvard University, several persons had occasion to see one or more of Nichols' paper models as he was working or playing with them. Two of these persons were roommates of Nichols, another was a colleague in the Chemistry Department, and there may have been "one or two others." Nichols recalls having explained the intended operation of the puzzle to his roommate, Leon Levy, and he testified at trial that he had probably explained it to others "in response to their asking ... what in the world ... [he] was doing." All who may have seen the model were intimate friends of Nichols and he would have been "astonished if any

of them had felt free to do something with ... the idea...." (Tr. 897). However, Nichols testified that he relied on their friendship rather than exacting an explicit promise of secrecy.

After Nichols constructed the wooden block puzzle in 1968, he kept it primarily in his home, open to view by house guests. Nichols "made [no] effort to bring it to anyone's attention," but "[i]t was no secret to those who happened to encounter it." Moreover, he did not hesitate to explain the workings of the puzzle when asked to do so.

From time to time, Nichols took the puzzle to work at Moleculon, either to use various tools to work on it or to play with it during free moments. It was on one of these occasions that Obermayer noticed the puzzle on Nichols' desk. It may also have been seen by a few other Moleculon employees in Nichols' office. Moleculon did confidential work for the government and its offices were not open to the public in the regular course of its business. Moleculon employees had received security clearances from the government and had signed confidentiality agreements with respect to information obtained in the course of their work.

The issue is whether on the basis of these facts, the Nichols invention was "in public use" within the meaning of Section 102(b) more than one year before the date that the United States patent application was filed. Since that date was March 4, 1970, the critical date for purposes of Section 102(b) is March 4, 1969.

Moleculon urges that even if the paper cube and magnet model is found to represent a reduction to practice, the activity that occurred prior to construction of the wooden cube model was, in any event, within the "experimental use" exception. It is well established that "use of an invention by the inventor himself, or of any other person under his direction, by way of experiment, and in order to bring the invention to perfection, has never been regarded as such a [public] use." Such testing need not be carried out in secrecy or behind

locked doors in order to avoid becoming public use. *City of Elizabeth v. American Nicholson Pavement Co.*, 97 U.S. 126, 24 L.Ed. 1000 (1877); *TP Laboratories v. Professional Positioners*, 724 F.2d 965 (Fed. Cir.1984).

On the other hand, not everything that can be characterized as experimentation prevents a use from being a "public use." "It is settled law that the experimental use exception is not applicable to experiments performed with respect to unclaimed features of an invention." *In re Smith*, 714 F.2d 1127, 1136 (Fed.Cir.1983). "[T]he rule is that an invention is deemed functional for public use purposes when it can perform the general function for which it has been developed, even though the device might later be refined." *Id. quoting Atlas v. Eastern Airlines, Inc.*, 311 F.2d 156, 160 (1st Cir.1962).

Nichols' efforts during the years 1959–62 appear to have been devoted largely to refinement of the physical embodiment of the puzzle although he also directed some effort toward developing a mechanical means of assembly. Neither of these lines of experimentation, however, resulted in any limitations in the ultimate patent claims. Finally, Nichols certainly spent time engrossed in the puzzle aspects of his invention, but again, this could not accurately be characterized as experimental use as delineated in the caselaw.

While I agree with CBS that there was no experimental use after 1959, I nevertheless conclude that the Nichols invention was not "in public use" prior to March 4, 1969. The "public use" and "on sale" bars should be applied with a view toward furthering the underlying policies. In *Philco Corp. v. Admiral Corp.*, 199 F.Supp. 797, 815 (D.Del.1961). Judge Wright pointed out the problems engendered by attempts to apply hard and fast legal rules to the multitude of factual variations that arise and the importance of keeping in mind the policies underlying Section 102(b). In *Barmag Barmer Maschinenfabrik AG v. Murata Machinery, LTD*, 731 F.2d 831, 837 (Fed.Cir.1984), the Federal Circuit indicated that these policies "in effect, define the terms of [section 102(b)]."

The courts have identified four policies underlying Section 102(b). "Operating against the inventor are the policies of (1) protecting the public in its use of the invention where such use began prior to the filing of the application, (2) encouraging prompt disclosure of new and useful information, (3) discouraging attempts to extend the length of the period of protection by not allowing the inventor to reap the benefits for more than one year prior to the filing of the application. In contrast to these considerations, the public interest is also deemed to be served by (4) allowing an inventor time to perfect his invention, by public testing if desired, and to prepare a patent application." *TP Laboratories, supra* at 968.

In general, the courts have construed the public use bar very broadly. In the classic case of *Egbert v. Lippman*, 104 U.S. 333, 26 L.Ed. 755 (1881), for example, the inventor made and gave a single set of steel corset stays to his mistress. She used them in a series of corsets over a period of eleven years. The Supreme Court held that this was public use within the meaning of the statute because the invention had been given over for free and unrestricted use by a person other than the inventor: "If an inventor, having made his device, gives or sells it to another, to be used by the donee or vendee, without limitation or restriction, or injunction of secrecy, and it is so used, such use is public within the meaning of the statute, even though the use and knowledge of the use may be confined to one person." Thus, public use need not be commercial in nature, and need not occur "out in public" as that term is usually understood. For an invention to be in public use, on the other hand, it must be made available to someone else without restriction in its ordinary form or mode of operation.

In its post-trial answering brief, CBS argues that a "single use of an invention without restriction or limitation by even one person who is not an agent of the inventor is sufficient to constitute 'public use' ...". That appears to be an accurate

statement of the law; however, it is not an apt characterization of what occurred here. The essence of "public use" is the free and unrestricted giving over of an invention to a member of the public or the public in general. What I see here, by contrast, is the inventor's private use of his own invention for his own enjoyment. "Private use of one's own invention is permissible." *Bergstrom v. Sears, Roebuck and Co.,* 457 F.Supp. 213, 224 (D.Minn.1978).[2] "[A]n inventor may continue for more than a year to practice his invention for his private purposes or his own enjoyment and later patent it." *Id., quoting Metallizing Engineer Co. v. Kenyon Bearing & A.P. Co.,* 153 F.2d 516, 520 (2d Cir.1946), *cert. denied,* 328 U.S. 840, 66 S.Ct. 1016, 90 L.Ed. 1615 (1946).

While it is true that Nichols explained his puzzle to a few close colleagues who inquired about it and allowed Obermayer to in fact use it, the personal relationships and other surrounding circumstances were such that Nichols at all times retained control over its use as well as over the distribution of information concerning it. He never used the puzzle or permitted it used in a place or at a time when he did not have a legitimate expectation of privacy and of confidentiality. In these respects, I consider the exposure to Obermayer in Nichols' office no different than the exposure of Nichols' close friends in his home.

The fact that each person to whom the puzzle was demonstrated was not expressly sworn to secrecy is not determinative of, or even highly relevant to, the public use issue. The Court of Appeals for the Federal Circuit has recently noted that the importance of an express confidentiality agreement lies primarily in the fact that it is an indicator of the inventor's retention of control over the use of his invention. In *TP Laboratories, supra* at 972, the court said that "a pledge of confidentiality is

indicative of the inventor's continued control which is here established inherently by the dentist-patient relationship of the parties." Here also the relationship between the participants in the alleged uses evidences a retention of control by Nichols. None of those participants had any basis for inferring that the puzzle was being given over by Nichols for their free and unrestricted use. Holding the public use bar inapplicable in these circumstances will not remove anything from the public domain. Moreover, there is absolutely no evidence in this case of commercially motivated activity by Nichols during the relevant period. Accordingly, the underlying policy against extending the effective term of exclusivity is not offended by a finding that the Nichols invention was not in public use.

### B. "On Sale"

The formal written assignment to Moleculon of all rights to the Nichols invention is dated March 6, 1969, and thus occurred within the one-year grace period. That agreement "sells, assigns and transfers to Moleculon [Nichols'] entire right, title and interest in and to said TWIST PUZZLE invention together with the right to apply for Letters Patent of the United States and all other countries covering said invention." [DX–6]. CBS argues, however, that the Nichols invention was "on sale" prior to the critical date of March 4, 1969 by virtue of the negotiations between Nichols and Obermayer in January of 1969.

It is far from clear that what occurred in January of 1969 can fairly be characterized as an agreement or offer to assign Nichols' rights in his invention to his employer. Assuming for present purposes, however, that Nichols did agree in January of 1969 to assign to Moleculon any inchoate patent rights present in his puzzle, I nevertheless conclude that such a transaction does not fall within the "on sale" bar of

---

2. In *Bergstrom,* the inventor placed his invention, a fireplace grate, in his family room. Only members of the family, children of friends, and adult guests were admitted to the room, and there was no evidence to suggest that anyone "either understood its significance or were able

to convey visual observation of the grate to the public domain." *Bergstrom* at 224. Accordingly, the court held that the inventor did not place the invention in anyone's hand prior to the critical date.

Section 102(b) because only potential patent rights and not a device embodying the invention was involved.

■ There is no indication in the subsequent written instrument that the parties contemplated the sale or transfer to Moleculon of the single physical embodiment of the puzzle then in existence. Nor is there any other evidence in the record to that effect. The single issue to be decided, then, is whether an assignment or sale of the potential patent rights to an invention is a sale of "the invention" within the meaning of Section 102(b).

Considering that the assignment of patent rights, both before and after issuance of the patent, is clearly not a novel transaction, there is surprisingly little case law that squarely addresses this issue. What authority there is, however, indicates that Section 102(b) restricts only the sale of the physical embodiment of the invention and not the transfer of rights to a prospective patent covering the invention. In fact, this appears to be a long-established principle of hornbook law. Back in 1936, for example, the following rule was stated in C. Rivise & A. Caesar, *Patentability and Validity*, § 284 at 526–7 (1936):

> The statute refers to *the invention* being on sale, but obviously *the device of the invention* and not *the right to patent protection* is meant. For this reason, the Court in *United States Electric Lighting Co. v. Consolidated Electric Light Co.*, 33 Fed.Rep. 869 (S.D.N.Y. 1888) refused to invalidate Patent No. 306,980 for a method of manufacturing carbon conductors for incandescent lamps, though it appeared that the inventor more than two years prior to the filing of his patent application had assigned his patent rights to the plaintiff.

(Emphasis in original). Similarly, *Deller's Walker on Patents* states that "[a]n assignment of the right to secure a patent is not placing the invention on sale." Section 147, at 713 (2d ed. 1964).

On the other hand, I have been unable to find any case holding that the assignment or transfer of potential patent rights, without more, constitutes a sale of the invention within the meaning of Section 102(b). None of the cases cited by the defendant stands for that proposition.

In *Kock v. Quaker Oats Co.*, 681 F.2d 649 (9th Cir.1982), *cert. denied*, 459 U.S. 1147, 103 S.Ct. 787, 74 L.Ed.2d 994 (1983), the court undertook a detailed exposition on the so-called "experimental purpose exception" to the on-sale bar. That aspect of the case is clearly inapplicable here. More important, however, there was a clear sale and delivery of a prototype toy embodying the invention. In *Kock*, the original agreement was for the development and building of a prototype toy meeting certain specifications. Thereafter, the inventor and the toy company entered into an agreement selling the toy and assigning all rights to any invention embodied therein to the toy company. The court had no occasion to consider the significance of an assignment of inchoate patent rights absent a sale of the device.

Nor does *Manufacturing Research Corp. v. Graybar Elec. Co.*, 679 F.2d 1355 (11th Cir.1982) lend support to the position urged by the defendant. That case involved both a licensing agreement and an offer to sell the device itself, and the court did not focus on the effect of the licensing agreement alone. In finding that the device had been placed on sale prior to the critical date, the court held that "uncontroverted evidence establishes beyond doubt that [the first inventor] had sold such a device to [a manufacturer] [prior to the critical date]." *Id.* at 1361.

When an inventor assigns his rights in his invention to another, he simply places someone else in his shoes. For this reason, I perceive no reason why such a transaction should trigger the running of the one year grace period. Accordingly, I decline to hold that Nichols' invention was "on sale" in January of 1969.

The defendant further argues that Obermayer's contacts with Parker Brothers in February of 1969 constitute an invalidating offer to sell within the meaning of Section 102(b). Although it is settled law that offers to sell fall within the "on sale" bar,

*Chicopee Manufacturing Corp. v. Columbus Fiber Mills Co.,* 165 F.Supp. 307 (M.D. Ga.1958); *Timely Prods. Corp. v. Arron,* 523 F.2d 288 (2d Cir.1975), I do not believe that anything that occurred prior to March 4, 1969 can fairly be characterized as an offer to sell the invention.

██ On February 6, 1969, Obermayer telephoned Parker Brothers to determine whether they were interested in receiving a submission of a puzzle idea from an outside inventor. Nothing concerning the nature or workings of the Nichols puzzle was disclosed. Obermayer did not offer to sell anything; he merely inquired, in effect, whether offers from outsiders were considered by Parker Brothers and, if so, how one should be made. It was not until March 7, 1969, after the critical date, that Moleculon submitted detailed information concerning the puzzle for consideration by Parker Brothers.

## IV. THE UTILITY OF CLAIMS 3, 4, AND 5

██ Section 1.01 of the Patent Act authorizes the grant of a patent for "any new and *useful* process, machine, manufacture or composition of matter or any new and *useful* improvement thereof. . . ." (emphasis added). To meet the utility requirement thus imposed an invention must satisfy the following three tests: 1) it must be operable and capable of use, i.e., it must perform its designated function; 2) it must achieve "some minimum human purpose"; and 3) the purpose achieved must not be illegal, immoral, or contrary to public policy. 1 D. Chisum, *Patents* ¶ 4.01, 4–2 (1984).

Claims 3, 4, and 5 of the '201 patent read as follows:

3. A method for restoring a preselected pattern from sets of pieces which pieces have constantly exposed and constantly nonexposed surfaces, the exposed surfaces adapted to be combined to form the preselected pattern, which sets when in random engagement fail to display said preselected pattern which comprises:

A. engaging eight cube pieces as a composite cube;

b. rotating a first set of cube pieces comprising four cubes about a first axis;

c. rotating a second set of four cubes about a second axis; and

d. repeating steps (b) and (c) until the preselected pattern is achieved.

4. The method of claim 3 which includes rotating sets of cubes about one of three mutually perpendicular axes with reference to the composite structure.

5. The method of claim 3 wherein the sets of cubes are rotated through multiples of 90°.

CBS urges that these claims are invalid because they are inoperable.

██ Claim 3 is a method claim covering "[a] method for restoring a preselected pattern" after the puzzle has been randomized. It prescribes the general method of rotation to be used in attempting to solve the puzzle. CBS argues that this method calls for rotation of only *two* sets of pieces around only *two* axes, and, hence, is inoperable because a puzzle randomized or scrambled by rotation about three mutually perpendicular axes cannot be solved by rotation about only two axes. Claims 4 and 5 are dependent claims, and therefore, it is contended, incorporate the fatal defect of Claim 3.

CBS argues that pursuant to the text of Claim 3, the puzzle user, in order to carry out step (d), must go back and rotate precisely the same set of cubes around precisely the same axis as chosen in step (b), proceeding then to precisely the set and precisely the axis chosen in step (c), and so on, and so on. CBS seeks to bolster this argument by explaining the wording as a reference to a two-dimensional puzzle included in the original patent application and subsequently dropped. I do not find that line of reasoning persuasive. The original patent application had eight device claims and a single method claim. That method claim was clearly intended to cover the cube puzzle with its three axes, as well as the flat embodiment with four axes that was later deleted. Moreover, it makes no sense to explain the alleged reference to

two axes and two only, as an erroneous throw-back to a puzzle that itself had four axes. The draftsman of the patent application might well have chosen other, less ambiguous language; I believe, however, that he intended to use the words he did and that he understood them to allow for rotation around all three axes· at some point in the solution of the cube puzzle.

The law does not require a rigidly literal reading of claim language. Rather, "if the claim [is] fairly susceptible of two constructions, that should be adopted. which will secure to the patentee his actual invention, rather than to adopt a construction fatal to the grant." *Smith v. Snow,* 294 U.S. 1, 14, 55 S.Ct. 279, 284, 79 L.Ed. 721 (1938). Similarly, in *United States v. Adams,* 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966), the Court stated that "it is fundamental that claims are to be construed in the light of the specifications and both are to be read with a view to ascertaining the invention." In *Adams,* the Court looked to the specifications to determine the ends sought to be achieved by the contested patent. The Court concluded that the intent to employ a water electrolyte was obvious in light of the specifications, despite the failure to refer to any electrolyte in certain claims, and was plainly "not the after-thought of an astute patent trial lawyer." *Id.* at 49, 86 S.Ct. at 713.

It is plain from the specifications of the '201 patent that the user is to rotate sets of cube pieces about three axes in order to solve the puzzle. Not only are three axes an inherent feature of the $2 \times 2 \times 2$ cube described in the specifications, but there are explicit references to these three axes or the three corresponding coordinate planes in every part of the patent, from the abstract to the drawings. Accordingly, the text of Claim 3 should not be construed as limited to rotation about two axes unless it permits of no other construction.

Claim 3 clearly can be read to contemplate rotation about three axes. By using the indefinite article "a" (i.e. "*a* first axis," "*a* second axis"), it is left open to the user, when he comes to the third step, and is directed to repeat the first two steps, to go back to *the* first axis, or alternatively to select another axis instead, depending upon his solution strategy. This seems to be a reasonable interpretation of the words of the claim, and is clearly consonant with the implications of the rest of the patent and the intent of the patentee.[3]

It is further urged that the method Claims 3, 4, and 5 are not a useful or an enabling disclosure, in the sense of teaching anyone a method for solving the puzzle. Nor, it is alleged, is such a method of solution set out anywhere else in the patent. While the allegations are true, they are irrelevant. The object of a puzzle is to challenge the wits of ·the user and the puzzle isn't designed to carry out one particular "correct" series of moves. The solution is the converse of whatever sequence of steps is used to scramble the puzzle on a particular occasion. It is interesting to note in this regard that the Rubik's Cube puzzle is sold by Ideal with an instruction insert that describes little beyond the general method of scrambling the cube. The user is then instructed to "Return all 6 sides to their original solid colors." If CBS' argument is correct, Ideal has been selling a useless item.

There is a strong presumption that an issued patent has utility, since utility is one of the basic criteria for patentability. Accordingly, this presumption can only be overcome by clear and convincing evidence to the contrary. Ambiguous claim language, where such language can be read as easily to uphold the patent as to strike it down simply fails to reach the required level of proof to support a finding of invalidity. Moreover, it is axiomatic that claims

---

**3.** It is true that when one so construes Claim 3, it·is difficult to understand why Claims 4 and 5 were included since three mutually perpendicular axes and ninety degree turns are inherent in the cube puzzle described in Claim 3 and its solution. The fact that Claims 3, 4 and 5 may be coterminus, however, does not tender them invalid. It is further clear that Claim 4, being dependent, could not have been intended to broaden Claim 3 limited to rotations about two axes only.

are to be read in light of the specifications and with an eye to ascertaining the meaning of the patent. Bearing in mind the foregoing principles, I conclude that Claims 3, 4, and 5 of the '201 patent are not invalid for lack of utility.

## V. ANTICIPATION

To be patentable, an invention must be new at the time of its discovery by an original inventor. This novelty requirement is one of the essential prerequisites of patentability. 35 U.S.C. § 102. The test for lack of novelty, i.e., anticipation, is one of strict identity. "To anticipate a claim, a prior art reference must show each and every element claimed." *General Electric v. United States*, 215 Ct.Cl. 636, 572 F.2d 745, 768 (1978); *Leinoff v. Milona & Sons, Inc.*, 726 F.2d 734, 738 (Fed.Cir.1984). Anticipation will be found only if "all elements of a claimed invention arranged as in the claim" can be found in a single prior art reference. *Connell v. Sears, Roebuck & Company*, 722 F.2d 1542, 1548 (Fed.Cir. 1983). Since the requisite degree of identity is rarely found, anticipation has been termed a "technical defense." *Shaw v. E.B. & A.C. Whiting Co.*, 417 F.2d 1097 (2d Cir.1969); *Walker v. General Motors Corp.*, 362 F.2d 56, 58 (9th Cir.1966).

CBS contends that Claims 1 and 6 of the '201 patent are invalid under 35 U.S.C. § 102 because they are anticipated by the Gustafson patent. Since Claims 1 and 2 were formally disclaimed by Moleculon on April 19, 1983 it is necessary to consider only the validity of Claim 6.

Anticipation is to be determined by reference to the claim language of the patent whose validity is in question. Expressed another way, anticipation is determined by whether claim "reads on" the prior invention or reference. If every element of Claim 6 of the § 201 patent can be found in the Gustafson puzzle, then that claim is anticipated and therefore invalid. Claim 6 of the '201 patent reads as follows:

6. A puzzle comprising at least eight pieces, visually distinguishable indicia on at least one face of each piece with the eight pieces together having at least two visually distinct indicia, means associated with each of the remaining faces only of each of the pieces releasably maintaining the pieces in assembled relationship forming a composite structure, said maintaining means enabling three interaffiliated groups of four contiguous pieces each to be rotated respectively about three mutually perpendicular axes, the two distinct indicia being so located on the respective pieces that the groups can be rotated to effect the display of at least two distinct indicia of the composite structure.

The Gustafson patent teaches a "mechanical puzzle having a plurality of varicolored parts which are movable relative to each other to form various patterns." The puzzle consists basically of a spherical outer shell that rides on a substantially concentric spherical inner core. The outer shell is divided into eight equal parts which are held to the core by tongues that fit into and slide along a series of grooves cut into the core. Groups of four contiguous pieces, viz., hemispheres, may be rotated relative to one another around any of three mutually perpendicular axes.

Claim 6 of the '201 patent does not literally read on the Gustafson sphere because Nichols describes a solid cut by three perpendicular planes, while Gustafson is essentially a spherical shell cut by three perpendicular planes which rides on a spherical core. As a result, Claim 6 speaks of pieces with a plurality of faces (i.e. "the remaining faces") which do not have visually distinguishable indicia, while Gustafson's shell like octants have a colored "outer surface" and only one "inner surface."

CBS contends vigorously that the shell segments of the Gustafson puzzle have four internal faces because each edge is a face. In support of this position, Mr. Fischer, CBS' expert witness, argued that every solid, "even a piece of paper," has four faces, and, therefore, Nichols reads directly on Gustafson. While this may be technically correct, it flies in the face of the principle that words in patent claims are ordinarily to be given their usual meaning. I note, for example, that Gustafson, him-

self, distinguishes in his patent between the inner and outer *"surfaces"* of his pieces and their side *"edges"*.

Since Claim 6 contemplates a plurality of inner faces and Gustafson teaches a single inner face, Claim 6 is not anticipated by Gustafson.

## VI. OBVIOUSNESS

CBS further contends that if Claim 6 is not found to be literally anticipated by Gustafson, it is at least obvious in light of the prior art, and that Claims 3, 4, 5, and 9 are obvious as well. In support of this position, CBS argues that "[a]s a matter of law, patentability does not arise from a mere change in form." It is urged that the sphere and the cube are obvious alternative forms and patentability cannot arise from a mere substitution of one for the other. It is clear, however, that the old "negative rules of invention" that preceded the enactment of Section 103 are no longer determinative in deciding individual cases. *See Chisum*, § 504[5] (1984). Form may be insubstantial, or it may be the essence of the invention, as where form determines function.

█ The test of obviousness under 35 U.S.C. § 103 is whether "the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." *Graham v. John Deere Co.*, 383 U.S. 1, 17, 86 S.Ct. 684, 693, 15 L.Ed.2d 545 (1968). As explained in the *Graham* case, the following factual inquiries are to be made: 1) the scope and content of the prior art are to be determined; 2) differences between the prior art and the claims at issue are to be ascertained; and 3) the level of ordinary skill in the pertinent art is to be resolved. It is in light of these facts that a determination as to the obviousness of the subject matter as a whole is to be made. Secondary considerations, such as commercial success, long felt but unsolved needs, the failure of others, etc. may also be taken into account.

### A. The Prior Art

The parties agree that the Gustafson patent is the most pertinent prior art. As earlier noted, the Gustafson patent was not considered by the Patent Examiner. Of the five patents which were cited during the prosecution of the '201 patent, one was cited against the flat embodiment and was no longer relevant after that species was dropped and none of the other four covered a mechanical puzzle. Duggar, U.S. Patent No. 2,939,243, patented June 7, 1960, is not a puzzle patent at all, but claims toy building blocks mounted with magnets to hold together the assembled structures. The Bowden, British Patent No. 283,666 (1928), and Pyle, British Patent No. 675,678 (1952), patents were cubic puzzles, but they consisted of individual blocks designed to be assembled one by one to display a pattern or picture on the external faces of the composite cube. Finally, the Dreyer patent, U.S. Patent No. 3,222,072, was also basically an assembly puzzle. It consisted of a series of 27 cubes strung along an elastic cord, the object being to assemble the cubes into a single composite cube.

The only other prior art puzzle which warrants mention is the MacMahon puzzle which was invented in 1893. This assembly puzzle consists of eight multi-colored subcubes which can be arranged to form a composite $2 \times 2 \times 2$ cube. In its properly assembled form, each outer face of the composite cube must be of uniform coloration, and in addition, the color of the internal faces of the subcubes must be the same wherever two of the subcubes touch. The external coloration of this puzzle is similar to that of the Nichols and Rubik's cubes, with one solid but different color on each of the six sides of the composite cube.

### B. Level Of Ordinary Skill In The Art

█ The pertinent art is that of puzzle design. There does not appear to be any particular common denominator of formal academic training required; puzzle designers include artists, designers and other creative persons, as well as engineers and mathematicians. Still others active in designing puzzles are avid hobbyists, with

little closely related formal training. A good example of this is Nichols himself, with a Ph.D. in organic chemistry.

Although there are professional puzzle designers working for the large toy companies, it appears that few concentrate all their efforts on puzzle design. Moreover, the significant breakthroughs in puzzle design are not infrequently made by puzzle enthusiasts and hobbyists rather than professionals as evidenced by Gustafson, Nichols and Rubik.

Moleculon's expert witness, Gerald Slocum, who is one of the foremost puzzle experts and puzzle historians in the world, expressed his view that puzzles tend to arise as a single idea from a single individual. His study of nine hundred puzzle patents demonstrated that 86% were issued to persons who held no other puzzle patents, with another 10% of the inventors holding only two patents. He was also of the opinion that the level of skill in the art of puzzle design was very low compared to most scientific and engineering disciplines, because it tended to consist of isolated activity by individuals rather than a continuous building on an established base of knowledge. This explains the apparent discrepancy between the generally high level of education among those engaged in puzzle design, and the rather unsophisticated state of the puzzle art during the 1960's.

Based upon his study of the puzzle literature and patents, as well as his collection of puzzles, Slocum testified that the largest category of puzzles, patented and reported during that period were two- and three-dimensional jigsaw puzzles. The second largest category was two- and three-dimensional assembly puzzles. Finally, there were a few sliding-block puzzles, game puzzles, and some string or wire puzzles. Notably absent were complex mechanical puzzles.

Charles Zimmerman also testified as an expert witness for Moleculon. A civil engineer with a masters degree in structural engineering, Zimmerman worked in the Preliminary Design Department at Mattel Toymakers during the years 1963 through 1975. He was Supervisor of Preliminary Game Design at Mattel during 1968 and 1969, a position which included responsibility for developing a line of puzzles. He also was responsible for reviewing the hundreds of outside submissions received by Mattel. Zimmerman testified to the relatively unsophisticated level of the puzzle art during that period. He stated that he could "think of nobody in any toy company that was creating original puzzles, which were being marketed by toy companies." [Tr. 656]. The puzzles tended to be variations on old, familiar type puzzles, using attractive new materials. They did not involve elaborate mechanical mechanisms.

Based on the foregoing testimony, I conclude that the art of puzzle design was relatively unsophisticated and that artisans of ordinary skill in this field, while having higher than average education and intelligence, practiced the art as an avocation only.

## C. The Differences Between The Prior Art And The Subject Matter Claimed

Comparing the prior art to the subject matter of the '201 patent requires that Claims 6, 3, 4, 5, and 9 of the '201 patent be considered individually since some are limited to the cube form of the puzzle while others seek to claim more broadly.

### 1. Claim 6

As earlier indicated, the Gustafson puzzle is a sphere. Its surface is divided into octants which are capable of rotation in groups of four hemispherically related pieces around any one of three mutually perpendicular axes. The patent indicates that the external surface should bear some visual indicia, but no particular coloration is specified or claimed. Gustafson noted that:

> Assuming that certain color patterns are established in advance as the puzzle goals or solutions, it will further be understood that after the segments have been displaced from said established patterns that considerable imagination and color perception are required again to

move the segments into the established patterns.

Col. 5, 1. 71 to Col. 6, 1. 1.

In describing his invention, Nichols points out in the specifications that "other geometric configurations [than the cube] may be used.... For example, a sphere divided into eight octants represents the same concept in a different form." (Col. 2, 1. 29–32). Claim 6 is deliberately drafted to be broad enough to cover such a sphere. The subject matter of Claim 6 may therefore be described as including a sphere divided along three mutually perpendicular planes and held in assembled form while permitting three groups of four contiguous pieces each to be rotated respectively around three mutually perpendicular axes, said pieces together having at least two visually distinct indicia.

The only difference between Gustafson's sphere and the Nichols' sphere is that the user of the Gustafson puzzle rotates sets of octant shaped shells which are held into a composite sphere by a tongue-in-groove arrangement involving a spherical core, while the user of the Nichols sphere rotates sets of octant shaped pieces having a plurality of interior surfaces which are held together in a composite sphere by magnetic or mechanical means. While there is no outright concession by Moleculon in the briefing, I do not understand it to seriously contend that a puzzle designer of ordinary skill having been exposed to the Gustafson sphere would not have realized that Gustafson's shell pieces could be given a third dimension without interfering with their ability to rotate in sets around three mutually perpendicular axes. Indeed, Nichols himself, as well as Moleculon's experts, conceded that Gustafson's sphere and Nichols' Figure 4, depicting a sphere comprised of eight solid pieces, represented the identical puzzle concept. I, therefore, hold Claim 6 to be invalid under 35 U.S.C. § 103.

### 2. Claims 3, 4, 5, and 9

■ In contrast to Claim 6, Claims 3, 4, 5, and 9 are limited to cubic embodiments. Claim 3, and its dependent claims, 4 and 5, will read on the $2 \times 2 \times 2$ form of the puzzle, as well as on such larger cubic embodiments as the $3 \times 3 \times 3$ and the $4 \times 4 \times 4$, because it employs the open transitional phrase "which comprises." The term "comprising" denotes a patent claim as being "open," meaning that the recitation of structure in the claim is open to additional structural elements not explicitly mentioned. Rosenberg, *Patent Law Fundamentals* at 46 (1978).

Claim 9 on the other hand is limited to the $2 \times 2 \times 2$ form of the puzzle composed of eight subcubes. Although Claim 9 also uses the open transitional term "comprising," this limitation is imposed because the claim explicitly refers to "visually distinguishable indicia on three faces only of each cube ..." thereby excluding larger embodiments wherein the center cube(s) on a face will have only one colored surface. Claim 9, in contrast with Claims 3, 4, and 5, is also limited to a single preselected pattern consisting of a distinct indicia on each of the six faces of the composite cube.

As earlier noted, MacMahon teaches a cube shaped assembly puzzle. Even though there is a physical resemblance between Nichols' cube and the MacMahon puzzle in its assembled state, as puzzles they are fundamentally different in concept and challenge. Nothing in MacMahon suggests the rotation of pieces to create a preselected pattern.

Gustafson, of course, does teach the rotation of octants of a sphere to achieve a preselected pattern and the issue for decision is whether it would have been obvious to one of ordinary skill in the puzzle design art in the late 1960's to combine MacMahon and Gustafson in such a way as to come up with Nichols' cube puzzles. I conclude that nothing in the prior art suggests such a combination and that Claims 3, 4, 5 and 9 are not obvious from MacMahon and Gustafson.

CBS, as I understand it, urges that, while there is no express teaching of a combination in his patent, Gustafson's concept itself would suggest a cube shaped embodiment to one of ordinary skill in the art. It relies heavily in this regard on the testimony of Mr. Zimmerman that he would

have considered other possible shapes, including a cube, if the Gustafson puzzle had been submitted to him for commercialization by Mattel.

I agree with CBS that it would have been obvious to consider whether Gustafson's puzzle could be changed into other geometric shapes and to conclude that it would be possible to come up with a cube shaped embodiment. This does not mean, however, that the Nichols' concept for a cube shaped puzzle would obviously flow from Gustafson's concept or the patent describing it. Indeed, based on the record in this case, one can conclude with some confidence that the contrary is true. It would not have been obvious to realize that one could achieve a puzzle having many times the complexity, challenge and puzzle appeal of Gustafson by going to a cube and utilizing each of the 24 (as in the $2 \times 2 \times 2$) or more (as in the $3 \times 3 \times 3$ or $4 \times 4 \times 4$) exposed faces of the subcubes as distinct pieces of the puzzle pattern the location of which vis-a-vis each other exposed face could be varied through rotations around three axes.

Slocum, like Zimmerman, acknowledged that, as a puzzle designer, he would have recognized the possibility of going to a cube from the Gustafson sphere. Both explained, however, that the advantages of the Nichols' cube as a puzzle would not have been obvious. To Slocum, the Nichols' concept was "at the top of the list of breakthroughs;" to Zimmerman, it represented "a quantum leap from a sphere."

The most persuasive facts with respect to the nonobviousness of Nichols' puzzle, however, are those facts relating to the activities of Gustafson, himself. Gustafson is certainly one of at least ordinary skill in the art. Although not a breakthrough of the magnitude of the Nichols cube, his puzzle represents a significant advance over the prior art. After developing that puzzle, he realized that it would be a better puzzle if it offered a greater challenge than was presented by the manipulation of the eight faces covering his sphere. As a result, he considered other solids which would offer more complexity than the sphere. During this search for greater complexity, he dismissed the cube as offering only six faces and went on to work with such larger platonic solids as the octahedron, tetradecahedron, and icosahedron. None proved satisfactory, however. If the inventor of the Gustafson sphere did not perceive the superior puzzle which Nichols conceived, I am unwilling to say that one of ordinary skill in the art would have found Claims 3, 4, 5, and 9 obvious from Gustafson. Accordingly, I hold that Claims 3, 4, 5, and 9 are nonobvious and, therefore, valid.

## VII. INFRINGEMENT OF CLAIM 9

Claim 9 is the narrowest apparatus claim. Moleculon maintains that it is infringed by CBS's two $2 \times 2 \times 2$ puzzles—Rubik's Pocket Cube-Japan and Rubik's Pocket Cube-Taiwan. Claim 9 reads:

A puzzle comprising eight cubes, visually distinguishable indicia on three faces only of each cube with the eight cubes together having six visually distinct indicia,

means associated with each of the remaining faces only of each of the cubes releasably maintaining the cubes in assembled relationship forming a composite cube, said maintaining means enabling three interaffiliated groups of four contiguous cubes each to be rotated respectively about three mutually perpendicular axes,

the six distinct indicia being so located on the respective cubes that the cube groups can be rotated to effect the display of a distinct indicia on each of the six faces of the composite cube.

According to CBS, Moleculon has not proved infringement of this claim by either of these accused puzzles because (1) their pieces are not "cubes" and have no "remaining faces," (2) their pieces are not "releasably maintained" in a composite cube, and (3) they have no "means associated with each of the remaining faces only" to hold the pieces together.

### 1. "Cubes" Having Interior "Remaining Faces"

 CBS argues that the pieces of Rubik's Pocket Cubes are not "cubes" because a portion of each of the internal faces of each piece has been cut away to provide or accommodate the means for holding them in a composite cube. It is literally correct that the pieces of Rubik's Pocket Cubes are not geometrically pure cubes. It is also true, however, that from the perspective of the puzzle user they are accurately described as cubes and that Nichols was describing his invention from that perspective. The fact that Claim 9 was intended to refer to pieces that appeared to be cubes when incorporated in the puzzle rather than pure cubes is indicated by Nichols suggested embodiments utilizing "a pop-in snap linkage" or a "tongue-in-groove arrangement" since one would expect these approaches to involve either an indentation in or a projection from the interior segment of the pieces. The reasonableness of Moleculon's interpretation of Claim 9's references to cubes is also demonstrated by the fact that Rubik referred to the equivalent pieces of his puzzle in his Hungarian patent as "cubes." (PX–66A; English translation). Similarly, Ideal's Rubik's Pocket Cube package refers to its pieces as "sub-cubes." (PX–67).

Just as Claim 9 does not require a perfect and complete cube, it also does not mandate perfect and complete internal faces which are square in shape. The accused devices have internal faces and the fact that they are partially cut away is not detectable from the perspective of the puzzle user. Accordingly, I conclude that the puzzle described in Claim 9 of the '201 patent has "remaining faces."

### 2. "Means ... Releasably Maintaining The Cubes In Assembled Relationship Forming a Composite Cube"

 CBS contends that the word "releasably" limits Claim 9 to structures the components of which can be disengaged from one another. Accordingly, it is urged, this claim covers Nichols' magnetically engaged cube, but not the various Rubik's cubes which are held together by complex mechanical mechanisms that do not lend themselves to ready disengagement during play.

CBS argues at length that in Nichols' early drafts of his patent application he used the term "releasably engaged" to connote a structure held together yet capable of being pulled apart or disengaged. This special meaning of the term "releasably" is alleged to have been carried over into the phrase "releasably maintaining" in the final patent claims, the result being that those claims cover only structures capable of ready disengagement during play. I find the drafts which preceded the patent application to be ambiguous on the point. There is evidence that Nichols at times used the words "releasably engaged" in the manner urged by the defendant, but I fail to find the consistency of usage suggested. Were it otherwise, I would still not give those drafts weight, however, since they are not available to those who would seek to determine the scope of the patent.

Most importantly, it is clear from the patent application itself both that Nichols recognized that some structures embodying his invention could be pulled apart or disengaged during play, while others could not, and that he intended to claim both types of structure. In the specifications of the '201 patent, it is stated unambiguously that "the invention includes such devices wherein the engagement is provided by mechanical or magnetic means providing structural integrity without restriction of rotational freedom...." (Col. 1, 1. 30–34). It is also explicitly pointed out in the section entitled "Description of Preferred Embodiment" that while disengagement is an inherent feature of magnetically-engaged cubes "it is also possible to achieve engagement by mechanical rather than magnetic means, as for example by using a pop-in snap linkage, or a tongue-in-groove arrangement allowing rotation without disengagement." (Col. 2, 1. 48–52).

There are only two independent apparatus claims in the '201 patent, Claims 6 and 9. Both use the phrase "releasably maintain-

ing." Consequently, if the limitation urged by CBS is read into those words, there is a clear inconsistency with what the specification explicitly states to be the invention. While the meaning urged by CBS would not be unreasonable if one did not have the benefit of the specifications, in the context of the patent as a whole, it is far more reasonable to read the phrase "releasably maintaining" as referring to a means of holding the puzzle pieces in assembled relationship while permitting relative rotation of groups of pieces.[4]

■ CBS maintains, however, that file wrapper estoppel precludes Moleculon from asking this Court to interpret "releasably" as just suggested. The doctrine of prosecution history or "file wrapper" estoppel serves to preclude a patent owner from regaining subject matter that was surrendered in order to obtain a patent: "[W]here ... broad claims are denied and a narrowed one substituted, the patentee is estopped to read the granted claim as the equivalent of those which were rejected." *Keystone Driller Co. v. Northwest Engineering Corp.*, 294 U.S. 42, 48, 55 S.Ct. 262, 265, 79 L.Ed. 747 (1935).

■ In support of its position that Moleculon acquiesced in a narrowing construction of "releasably," CBS refers to a paragraph in the prosecution history in which Mr. Stevens, the patent attorney prosecuting the '201 patent on behalf of Nichols and Moleculon, made the following statement:

> At the interview the Examiner cited an additional reference, U.S. Patent 3,222,-072, Dreyer. This reference has been considered and clearly does not disclose sets of cubes maintained in releasable relationship. This is supported in Figures 2 and 3 wherein all the cubes are physically secured together. In Dreyer

the sets of cubes, such as in Figure 2, do not rotate about mutually perpendicular axes.... [DX–123, File Wrapper, at 35].

CBS argues that, by virtue of this statement, the '201 patent is limited to means of assembly that allow disengagement or disassembly of the composite structure.

Dreyer is an assembly block puzzle consisting of smaller blocks held together by an elastic band to provide a continuous unit. The puzzle is played by twisting the string of cubes in a variety of ways to create different shapes with the ultimate shape being a composite cube. Each cube in Dreyer is physically attached to the next cube by means of an elastic band, whereas in Nichols and in defendant's products, the cubes are not physically secured together in the Dreyer sense because they can be rotated during operation of the puzzle so that originally adjacent cubes are no longer adjacent to each other.

Stevens was trying to convey not that the Nichols puzzle may be separated when played, but rather the distinction that in Dreyer the cubes are permanently secured together in a particular order and there is no way to move, say, cube no. 3 out of its position. It will always have cube no. 2 on one side and cube no. 4 on the other no matter how they are twisted about. Stevens' explanation to the patent examiner that "releasably engaged," as used in Nichols, demonstrated movement quite different from the movement of cube pieces available in Dreyer, did not in any way restrict or limit the meaning of the term "releasably." He simply explained that the kind of releasability employed in the Nichols puzzle does not exist in Dreyer, where the pieces are held together by an elastic

---

**4.** The phrase "releasably maintained" was drafted by the Patent Examiner as part of a suggested allowable claim. Nichols testified at trial that he accepted the term as written because "my general reaction ... was that it was a good description of my invention, my puzzle device.... My general reaction was that it was a good description because maintaining ... describes to my ear more effectively what the means are really to do, maintain this as a cubic assembly, than the word 'engage,' which alone

doesn't say quite as much about it. But my reaction was to this basic linguistic level that it sounded to me like an intended improvement on the part of the Examiner, and I was willing to keep it as such.... My understanding of the phrase 'releasably maintain' was that it referred to a maintained structure, that is, one which is kept in the existing state, but which was releasable in the sense that it could be freed from that restraint in order to allow rotation." [Tr. 987–989].

cord and can never be rotated in sets so that adjacent cubes cease to be next to each other.

### 3. "Means Associated With Each Of The Remaining Faces Only Of Each Of The Cubes"

 Nichols' embodiment using magnets to "releasably" maintain the cubes in an assembled relationship forming a composite cube had magnets implanted in each of the faces which did not have a "visually distinguishable indicia" on it. Moreover, the mechanical means suggested by Nichols for releasably maintaining the cubes in a composite—i.e. "a pop-in snap linkage" or "a tongue-in-groove" arrangement—could presumably be executed in such a manner that there was either physical contact between the means and each internal face or incorporation of the means into each internal face. CBS relies upon these facts and the above-quoted language of Claim 9 in maintaining that such contact or incorporation is a material limitation on that claim. I find this reading of Claim 9 unduly restrictive, however.

"Associated" is not commonly regarded as limited to physical connection. It is frequently used, for example, to refer to component parts which unite with one another in function.[5] For this reason, I agree with Moleculon that "associated with" does not require contact with or incorporation in each internal face. I cannot agree, however, that it is broad enough to encompass any means which directly or indirectly "maintain[s] these [interior] faces in their physical relationship to the faces of the neighboring subcubes." (Pl. Br. p. 103).

The means for "releasably maintaining" in Claim 9 does not hold the physical relationship of an internal face to any given face of a neighboring subcube. The only physical relationship which it does maintain is the "assembled relationship forming a composite cube" and the means perform precisely this same function for the external faces as well as the internal ones. Since we know that the draftsman, by virtue of his reference to the "remaining faces only," meant to convey the idea that the means was associated with the internal faces in a way it was not associated with the external faces, Moleculon's broad interpretation of "associated" cannot be accepted.

This does not end the matter, however. The internal faces of the subcubes of Rubik's Pocket Cube-Taiwan are partially cut away in such a manner that the structure constituting each face acts as a tongue which fits into grooves formed by other internal pieces so as to releasably maintain the integrity of the composite cube. Clearly, this relationship between the "means" and the "remaining faces only of each of the cubes" is an "association" within the meaning of Claim 9.

The mechanical "means" for maintaining the integrity of the composite cube of Rubik's Pocket Cube-Japan differs from that of the Taiwan pocket cube. While the "means" of "releasably maintaining" the Japanese version also relies upon the tongue-in-groove principle, the structures constituting the interior faces do not serve as the tongues.[6] They do cooperate with the "means," however, in maintaining the integrity of the composite cube by helping to maintain the alignment of the subcubes. Because of this cooperation in function, I conclude that the internal faces are "associated with" the means for "releasably maintaining" the Rubik's Pocket Cube-Japan.

 Even if the Japanese puzzle did not literally infringe Claim 9, however, I would nevertheless conclude that infringement has occurred under the doctrine of equivalents. "Under the doctrine of equivalents,

---

5. *See, e.g., The Concise Oxford Dictionary* (1982) (joined in . . . function); Burton, *Legal Thesaurus* (1980) ("cooperant, cooperative, . . . coworking"); *Webster's Unabridged Third New International Dictionary* (1966) ("closely connected, joined, or united with another as in interest, function, activity, or office").

6. The subcubes of the Rubik's Cube-Japan slide around on the surface of an internal sphere in the same manner as the shell pieces of the Gustafson puzzle. The "tongues" or "tabs" which fit into receptacles on the surface of the sphere are mounted on posts which are supported by the rear surfaces of the *external* faces and do not touch the *internal* faces.

an accused product that does not literally infringe a structural claim may yet be found an infringement 'if it performs substantially the same function in substantially the same way to obtain the same result' as the claimed product." *Hughes Aircraft Company v. United States,* 717 F.2d 1351, 1361 (Fed.Cir.1983). Rubik's Pocket Cube-Japan is the same puzzle as the Nichols' 2 × 2 × 2; it functions in the identical manner to provide precisely the same challenge. The only difference, assuming no literal infringement, is that a tongue-in-groove, mechanical means not associated with "each of the remaining faces only" has been substituted for a tongue-in-groove, mechanical means which is so associated. Given the "quantum leap" above the prior art which the '201 patent represents, it is clearly entitled to a broad enough range of equivalents to encompass the Rubik's Cube-Japan.

## VIII. CONTRIBUTORY INFRINGE-MENT OF CLAIMS 3, 4 AND 5

■ The parties agree that method Claims 3, 4, and 5 can be infringed only by a puzzle user. For this reason, Moleculon has charged CBS with contributory infringement under 35 U.S.C. § 271(b), rather than with direct infringement. Section 271(b) reads simply:

(b) Whoever actively induces infringement of a patent shall be liable as an infringer.

CBS is liable under this statute, according to Moleculon, because it has furnished others with a puzzle and accompanying instructions which facilitate and encourage their infringement of Claims 3, 4, and 5.

CBS first asserts that one using a Rubik's Cube in accordance with Ideal's directions would not infringe these claims. In support of this argument it suggests a number of distinctions between Claims 3, 4, and 5 and the operation of the Rubik's Cube. However, each is inconsistent with the interpretations of the patent claims I have heretofore adopted and does not provide a basis for a holding of no contributory infringement.[7]

CBS' second argument is that there can be no finding of contributory infringement absent a finding of direct infringement and that there has been no evidence of anyone solving a Rubik's puzzle using the method of Claims 3, 4, and 5. While this contention merits more extensive discussion, I find it unpersuasive.

I assume, without deciding, that Moleculon has the burden of proving by a preponderance of the evidence that there has been direct infringement of the method claims within the United States.[8] I further as-

---

7. Those suggested distinctions are:
 (a) no Rubik's puzzle infringes because its pieces are not "cubes;"
 (b) no Rubik's puzzle infringes because it cannot be restored to its pre-selected pattern (assuming three set/three axis randomization) by rotating only first and second sets or by rotating about only a first and second axis;
 (c) no Rubik's puzzle fits the description "engaging eight cube pieces as a composite cube" because this cannot be done with just eight pieces in a 3 × 3 × 3 or 4 × 4 ×4 cube, and because no external pieces of any Rubik's puzzle can be engaged without employing additional pieces;
 (d) neither Rubik's Cube nor Rubik's Revenge fits the description "rotating a first set of cube pieces comprising four cubes about a first axis" because you have to rotate nine cubes in a 3 × 3 × 3, 16 in a 4 × 4 × 4.
 Distinctions (a) and (b) are rejected because Claim 3, 4, and 5 do not require pure cubes and are not limited to puzzles which permit rotation

about only two axes. Distinctions (c) and (d) are rejected because use of the word "comprising" makes these claims "open" ones.

8. Since the record shows that the conduct which CBS has been inducing when performed, would constitute direct infringement of Claims 3 and 5, it can be argued with some force that the inducement and the threat of direct infringement engendered thereby is enough to warrant injunctive relief in Moleculon's favor. *Graham Paper Co. v. International Paper Co.,* 46 F.2d 881, 886 (8th Cir.1931) ("Defendant contends there could be no contributory infringement apart from a direct infringement. A completed act of infringement is not necessary to afford ground of [injunctive] relief. Threatened infringement is sufficient."); *see Leavitt v. McBee,* 124 F.2d 938, 941 (1st Cir.1942) ("It is well settled that a court will enjoin threatened infringement."); *Anraku v. General Electric Co.,* 80 F.2d 958, 965–66 (9th Cir.1936) (threatened sales of infringing lamps sufficient basis for injunctive relief).

sume, without deciding, that this means Moleculon must show that someone in the United States actually *solved* a particular accused device by using one of the methods described in Claims 3, 4, or 5.[9] I do not assume, as does CBS, that Moleculon must make the required showing of direct infringement by direct, as opposed to circumstantial evidence. As with the vast majority of legally relevant facts a party can carry its burden of proof as to the fact of direct infringement with circumstantial evidence. *Bergstrom v. Sears, Roebuck & Co.*, 496 F.Supp. 476 (D.Minn.1980).

Ideal has sold tens of millions of dollars worth of Rubik's Cube puzzles, several millions of dollars of Rubik's Revenge puzzles and well over a million dollars of Rubik's Pocket Cube puzzles. In the first eleven months of 1981 alone, 8,400,000 Rubik's Cube puzzles were sold by Ideal in the United States. Each of these millions of puzzles can be operated in a manner which constitutes a direct infringement of Claim 3.[10] Thus, for example after randomization through rotation of sets of cubes around two or more axes, each can be restored to its preselected pattern by rotating sets of cubes around two or more axes.

Each of these millions of puzzles has been sold with an instruction sheet which teaches the preselected pattern, randomization, the objective of restoring the preselected pattern, and the pursuit of this objective through the rotation of sets of cubes around two or more axes.[11] Each of these instruction sheets contains a notation, "IF YOU GIVE UP ... we've got the solution and its available by mail." Those soliciting this assistance have been sent a booklet entitled "The Solution" which of-

fers instruction on how to solve the puzzle. Any person following these instructions successfully would directly infringe Claim 3.

Purchase of one of the accused puzzles involves more than a negligible investment. Rubik's Cube puzzles, for example, were originally sold by Ideal to retailers at a price of $6.19. This fact as well as the mind set which prompts such a purchase and the nature of the puzzle itself provide assurance that most of these puzzles have experienced substantial use and that such use has been directed to accomplishing the objective of restoring the preselected pattern.

Based on the foregoing evidence, it is clearly more likely than not that each of the three types of accused puzzles has been used in the United States to infringe Claim 3 and that Ideal, by selling these puzzles and distributing its literature, has induced those direct infringements.[12]

While this circumstantial evidence provides ample support for these conclusions, I note that they are also supported by the eyewitness testimony of Dr. Obermayer. His testimony, which I credit, was that he had witnessed a "Rubik's Cubathon" at a shopping mall in Burlington, Massachusetts, during which each of approximately sixty contestants was provided with a scrambled Rubik's Cube. As Obermayer watched, many of these contestants returned their Rubik's Cube to its preselected pattern. While this witness could not say that any contestant rotated sets of cubes around two or more axes, it is more likely than not, given the competitive nature of the Cubathon, that the cubes had been ran-

9. Moleculon argues that since the invention is a puzzle, there is direct infringement of Claim 3, for example, whenever a person rotates sets of cubes around two or more axes *in an attempt* to restore the preselected pattern.

10. The same can be said for Claims 4 and 5, but it will suffice for present purposes to discuss only contributory infringement of Claim 3.

11. The instructions expressly depict only rotation of sets of cubes around two axes, but implicit in the presentation is the fact that the randomization and the solution may involve

rotation around more than two axes. Similarly, the instructions for Rubik's Revenge and the Pocket Cubes do not expressly teach rotation of sets of cubes as the manner of solution, but that message is implicit.

12. Moleculon has asked me to take judicial notice that people have used Ideal's puzzles in the United States and has supported that request with literature describing their use. There is no need to take judicial notice of this fact, however, since the record evidence establishes it as well as the additional fact that persons have *solved* each of these puzzles in the United States.

domized in a way which required such rotation in order to restore the preselected pattern. Based on Obermayer's testimony, I conclude that the Rubik's Cube puzzle was used to directly infringe Claim 3 of the '201 patent in Burlington, Massachusetts, and that Ideal, by marketing the Rubik's Cube and sponsoring the Rubik's Cubathon, induced that infringement.

## IX. CONCLUSION

For the foregoing reasons, I conclude (1) that Claims 3, 4, 5 and 9 of the '201 patent are valid, (2) that CBS has induced infringement of Claim 3 by selling and by instructing others in the use of Rubik's Cube, Rubik's Revenge, Rubik's Pocket Cube-Taiwan and Rubik's Pocket Cube-Japan, (3) that CBS has infringed Claim 9 by manufacturing and selling Rubik's Pocket Cube-Taiwan and Rubik's Pocket Cube-Japan, and (4) that CBS is not entitled to an award of counsel fees.